UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH A
CELLULAR PHONE NUMBER 646-484-
9283 THAT IS STORED ON PREMISES
CONTROLLED BY GOOGLE LLC

No. 2:23-mj-53-KFW

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, KEVIN KELLEY, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number 646-484-9283, ("the SUBJECT PHONE"), that is stored at premises controlled by Google LLC, an electronic communications service and/or remote computing service provider headquartered at 1600 Amphitheater Parkway, Mountain View, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since July 2005. I am currently assigned to the Cyber Crimes Squad of the FBI's Boston Field Division. I successfully completed the 21 weeks of New Agent Training at the FBI Academy in Quantico, Virginia. During that time, I received training in physical

1

surveillance, legal statutes and procedures, financial investigations, money laundering techniques, asset identification, forfeiture and seizure, confidential source management, and electronic surveillance techniques, including Title III monitoring. Since joining the FBI, I have investigated violations of federal law, including those related to counterintelligence, counterterrorism, white-collar crime, violent crime, and criminal cyber intrusion violations. I am currently assigned to work primarily cases involving criminal cyber intrusion violations. As an FBI agent, I am authorized to investigate violations of federal law and to execute warrants issued under the authority of the United States. I have participated in the execution of warrants involving the search and seizure of computers, computer equipment, software, and electronically stored information.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 USC § 844, 18 USC §1038, 18 USC §1030 and 18 USC § 875 have been committed, are being committed, and will be committed by PASQUALE LAPOMARDA, IV ("SUBJECT") and possibly others unknown at this time. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes as further described in Attachment B.

**PROBABLE CAUSE**

*Overview of Incidents*

5. The FBI has an open investigation of a distributed denial of service attack ("DDoS") against a Portland, Maine-based victim company (Victim 1).[1] The first DDoS attack occurred on or about December 20, 2022. On the same date, senior company officials employed at Victim 1 began receiving phone calls from spoofed telephone numbers, with the caller using voice distortion software or similar technology to disguise his/her voice. From December 20-29, 2022, a large number of phone calls were placed to Victim 1 office phones, employee personal phones, and in some instances, to employees' family members' phones. The substance of the initial calls included threats of additional cyber attacks, exposure of client information on the internet, and doxing of employee information on a specially-created webpage unless a $300,000 ransom was paid in Bitcoin.[2] Later calls were more aggressive, including death threats, discussion of bomb threats, additional cyber attacks, exposure of client information, involvement of an organization called "Final Solution, LLC," and discussion of targeting family members unless the $300,000 ransom was paid. On December 22 and December 28, 2022, bomb threats were called in at Victim 1's address in Portland, Maine. Between December 21 and December 29, 2022, at least eight swatting calls were phoned in to area law enforcement.[3] Two of those eight swatting calls involved Victim 1 employees' former residences and victimized people not employed by Victim 1.

---

[1] A DDoS attack is a malicious attempt to disrupt the normal traffic of a targeted server, service, website or network by overwhelming the target or its surrounding infrastructure with a flood of internet traffic sent to the targeted internet protocol (IP) addresses.

[2] Doxing is the act of publicly listing personally identifiable information or other sensitive information about an individual, company or organization, usually on the internet.

[3] Swatting is a criminal harassment tactic, in which a person communicates an emergency situation to a dispatcher, usually involving a reported violent act such as a murder, hostage situation, suicidal person, or bomb threat. Swatting calls involve sending law enforcement to another person's address, who is the intended recipient of harassment. The term swatting is derived from the term SWAT, or Special Weapons and Tactics, which is a specially trained law enforcement team that can respond to high-risk situation such as those described above.

6.  There is probable cause to believe that SUBJECT used the SUBJECT PHONE in order to carry out the DDoS attacks, bomb threats, swatting calls, extortion demands and threat calls against Victim 1. There is also probable cause to believe that the contents of the SUBJECT PHONE and associated data will help law enforcement personnel identify any other individuals involved in this event.

## *DDoS Attacks*

7.  In December 2022, the FBI initiated an investigation into the DDoS attack against Victim 1, located in Portland, Maine. Victim 1 is a company that offers integrated technology solutions in the information technology and software services sector. Victim 1 employs over 150 people and has hundreds of clients in Maine and around the United States.

8.  On or around December 20, 2022, Victim 1 experienced a DDoS attack, which targeted critical tools and services Victim 1 provides to their clients. Some of those tools and services are hosted on servers by a company located in Austin, Texas. The most critical of affected services is known as "N-Central," which is a remote-managing tool that Victim 1 uses to manage approximately 300 clients. Victim 1 officials described N-Central as their "crown jewel" in managed-service provider offerings, and a hack of N-Central would allow full access to client information.

9.  The DDoS attack on December 20, 2022 interrupted Victim 1 operations from approximately 3pm until approximately midnight. Resolving the DDoS attack required Victim 1 to immediately bring in vendors to assist in mitigating the attack and regain control of their systems, and also to ensure Victim 1 was not the victim of greater cyber damage, such as malware, exfiltration of data, modification of files and file permissions, escalation of privileges,

or lateral movement across servers and systems. Victim 1 hired an external cybersecurity firm to assist in this task.

10.  A second DDoS attack occurred on December 28, which lasted from approximately 8:30pm until midnight. It interrupted Victim 1 virtual private network ("VPN") service to Microsoft Azure and connectivity to Victim 1's Manchester, New Hampshire office. Though shorter in duration, this DDoS attack again required a surge of resources in order for Victim 1 to regain control and restore client services.

11.  Interviews conducted by the FBI of numerous Victim 1 employees identified one consistent suspect for the DDoS attacks, swatting, bomb threats and threat calls. Former Victim 1 employee, SUBJECT, was employed as a Network Operations Center (NOC) technician from approximately March 2020 until March 2021. SUBJECT worked daily in N-Central to help manage clients' needs. By virtue of his employment at Victim 1, he would have known and understood N-Central and other Victim 1 tools were housed at servers in Austin, Texas. Fundamentally important in a DDoS attack, SUBJECT would have known what internet protocol (IP) addresses to target, including Victim 1 IP addresses for their video communication server expressway ("VCSE"), their secure virtual private messenger ("ZixVPM") tool and N-Central. That information was posted on a doxing website, later described in this affidavit.[4] Victim 1 provided that at the time of his firing, SUBJECT did not return a company-provided laptop, and that SUBJECT had downloaded a significant amount of company information into a zip file which was not recovered by Victim 1. Victim 1 was able to determine the information SUBJECT downloaded included client information and internal company information.

---

[4] The website syseng.info doxed employee information, but also included technical information such as the IP addresses for specific functions within Victim 1. The following IP addresses were posted on syseng.info: "zixvpm01/199.119.109.108" [virtual private message service]; "nc.syseng.com/192.135.200.196" [N-Central service]; "vcse.syseng.com/24.97.162.253/5061/SIP" [Victim 1's video communications system].

5

*Bomb Threats*

12. On December 22, 2022, and again on December 28, 2022, bomb threats targeting Victim 1's address in Portland, Maine were called into the business line of the Portland, Maine Police Department. In both bomb threats, the caller claimed to have planted propane bombs throughout the building along with hundreds of pounds of fertilizer. The caller told dispatch "this is my way to get back" and "I'm going to send them off." The caller told dispatch that the bombs would go off in 30-60 minutes. As a result, Portland Police Department responded to the location with six officers, two bomb technicians, a bomb-sniffing dog, and closed off sections of Federal, Exchange and Congress Streets in Portland while conducting sweeps of the building. No bombs were found.

13. The number that called in the threat on December 22 was from a number that Portland Police Department determined to be a spoofed number that belongs to a family member of the president of Victim 1. The president of Victim 1 informed responding Portland Police Department officers that Victim 1 and its employees had been the recent target of numerous swatting incidents and harassing calls, all of which came from spoofed numbers, and some of which appeared on caller ID as phone numbers of family members of Victim 1 employees. The president of Victim 1 provided to Portland Police Department that a former employee, SUBJECT, was terminated in March 2021 and that the people targeted worked with SUBJECT. Furthermore, SUBJECT had knowledge of the systems Victim 1 uses and that SUBJECT could be responsible for the DDoS attack, bomb threats, extortion calls and swatting. Victim 1 officials provided that they believed SUBJECT resided in Florida. Victim 1 provided two telephone numbers to the FBI that SUBJECT used on his resume and in his hiring application: the SUBJECT PHONE and 774-334-4056.

14.     The FBI requested information from Google through a voluntary emergency disclosure request in late December 2022. Google confirmed the subscriber of SUBJECT PHONE is SUBJECT.

15.     The December 28 bomb threat came from another spoofed name/number. The caller admitted to dispatch that he had "stolen" the phone number. As a result of the prior interviews of Victim 1 officials, which indicated a disgruntled former employee was calling in false reports, Portland Police Department documented, but did not respond to, this incident.

### *Threat, Extortion and Harassment Phone Calls*

16.     Starting on or about December 20, 2022, the company leadership of Victim 1 began receiving phone calls from spoofed telephone numbers. Some of those calls went to the company business lines, other calls went directly to personal cell phone numbers.

17.     On December 20, 2022, Victim 1's president, ("Victim 2") received the following voicemail message on his/her cell phone.

"Hi [redacted], listen here, all this shit for your company is probably doomed and its off-line, you understand? Your fucking SIP connection is off-line, and your fucking goddamn end central [N-Central] is off-line, all your customers are not, you know, actively, you know, use, being able to actively use your services. Everything for you currently is off-line. Understand that? Right? And we also have all of the um, [U/I] all of your data back up onto another server. We have access to your network, we have everything on you, I have your address here. So I think the best thing for you right now since you're losing money is cooperate, a small fee of one hundred, of three hundred thousand dollars, versus the millions you're going to be losing if this goes on for the next week. Its your choice. Because you know, I can make this happen for the whole year. This is not difficult thing. Plus all the information on your customers and the

information on your employees get most definitely leaked. So, cooperate. A small fee of one hun 300k, or millions of money lost and all the data on your company released. Its your choice. Small fee, or big price"

18.     On December 29, 2022, Victim 2 received the following voicemail message on his/her cell phone:

"Yeah, same, um, how's it going today buddy? So [redacted], this is the deal now, okay? Let me explain this to you very nice and legibly. Okay, your VPN is now down to connect to the server internally, okay? So, the uplink is also going to be hit, also all your employees social security numbers, including yours is saved up right now we have all of them. Um, all the information for reliance, right, it will be leaking soon, we already have the information about your NOC engineering team, including your information leaked on syseng dot info, s-y-s dot i-n-f-o, which is leaked, okay? We're gonna be gathering more information and collecting it on you and all your employees. Right now its just the NOC engineers and yourself, but soon you know, we'll throw in [redacted] and all your pin pushers and the secretary I just talked to to get transferred to your line. We're going to be posting all that information too. You already just got your building bomb threated two fucking times. Um, [redacted] just had the fucking police department at his house for the second time because his wife [redacted] is a bitch. Anyway, if you want all this to stop, okay, next time there is a phone call from us, you're going to pick up the phone, yourself, and let your secretary and stop telling everyone to hang up the phone when we give a fucking phone call, okay? This isn't some bullshit, where we're like oh harassing you for a couple chuckles and laughs, no. This is the deal. No one is harassing, we're about when we fucking say we're going to do something it is going to happen, okay? When we say we did something, we fucking did it. It isn't bullshit, okay? This isn't some happy laughing fucking shit. And if you keep fucking playing

around, and keep fucking with us about the money, next time, you're not going to like what happens, okay? We can go at this all day, all year. For the next decade if your company is still alive after we're done. So cooperate, send about, send three hundred thousand dollars in BTC, and cooperate. Its that easy, I already left phone lines on your shit, on your personal phone, I've already called that. So, you cooperate, everything goes to your advantage. You get to go back to doing your normal shit, not having to mitigate DDoS attacks, not having to worry about your customers information getting leaked and you can go back to making money, 'cause right now you're losing it. Everyone seeing what's happening, and you're going to be losing clients, everything. So keep playing around. You want to play prideful, balls, play the my dick is the biggest game, go on. Watch what happens, because your dick is not bigger than mine."

19. On December 28, 2022, Victim 1's chief financial officer ("Victim 3") received the following voicemail message on his/her cell phone:

"Yeah, hello [redacted], umm this is the situation for you buddy. You know I suggest you load up about three hundred thousand dollars worth of, uh, BTC or we're gonna have some problems here [redacted]. You already got your house hit at [redacted], so if we want to keep playing this game we can, you know. We can go on for a while, we can play this game and you're just gonna get more and more fucked over. Your company is getting its servers disrupted, getting everything umm, fucked, all your employees are getting swatted, also if you go to syseng dot info (syseng.info), s-y-s-e-n-g dot i-n-f-o, you go there, you're going to find your information sitting there, on the internet along with all the NOC engineering team, including [redacted], your uhh, president over there. All that information will be sitting there [redacted]. So you want to keep playing this game this is what's going to occur for you. If you just want to just go in, you know, face the problem, pay the 300k and you won't have anymore problems. Now if we just need to

have a conversation, and where you have three hundred thousand dollars worth of bitcoin ready for me and the team of Final Solutions and everything will be solved. This is not a troll, this is not bullshit, we are not fucking playing games with you. This is what it is. Your going to pay the money and your going to do what is fucking owed here, okay? This is not some little fucking whack-a-mole bullshit nigger game. This is the fucking facts, this is the fucking solution that I'm giving you. You're the fucking CFO, you manage the funds, so send the fucking funds that way. You want to keep playing the prideful little prick, then okay, we can play the prideful little prick. Guess what happens to the prideful little prick every time? He gets fucking killed. Okay? I have people, we have people in Maine, okay? We can have, we can arrange for them to show up at your NOC engineers houses, and your secretaries, and your help desk advisors, your off-site engineers, everyone. We can arrange that. Or you pay the ransom of 300k. If you want to fucking play games, sto... (unintelligible, end of recording)."

### *Syseng.info doxing website*

20. Along with the DDoS attack and extortion calls, the threat actor created a public-facing website, syseng.info, which posted a partial by-position list of Victim 1 employees, starting with president of Victim 1, then the NOC engineer manager, then multiple NOC engineers. The doxed information included names of spouses, addresses, telephone numbers, social media accounts and email addresses, vehicles, employment history, liens and criminal history. The doxed information was similar to that which can be obtained through fee-for-service commercial databases found on the internet. Of the 12 Victim 1 employees listed on syseng.info, six were swatted and the other is Victim 2, who received a high volume of threat/extortion calls.

21. The threat caller made numerous references to syseng.info over multiple calls to Victim 1 employees, threatening to expose more information, including Victim 1 client

information. In interviews with Victim 1 officials, exposure of client information was viewed as highly detrimental to Victim 1's reputation and business, especially as Victim 1 is an employee-owned company and could not withstand a loss in confidence by its clients. Based upon a request from the FBI sent to the "abuse" email contact for the website hosting service that hosted syseng.info, the domain was suspended for terms of service violations on approximately January 4, 2023.

*Swatting*

22. Starting on or about December 21, 2022, at least eight swatting calls took place involving current or former employees of Victim 1, at their current or former residences, or in one case, the employee's parent's residence. All of the victims, or likely intended victims, were members of the NOC at Victim 1. All of the calling numbers into dispatch were spoofed.

23. The first person swatted, Victim 4, is an employee of Victim 1, and is the NOC Manager. Victim 4 was swatted on December 21, 2022 at his home during the evening hours. Police that responded to that call in force, which was called in as a report of someone having killed Victim 4's grandmother and having Victim 4 at gunpoint. Unaware that the banging on his house downstairs were police officers, and unsure of the validity of dispatch trying to call Victim 4 directly to assess credibility of the threat, Victim 4 retrieved his handgun, fearing for the safety of his/her family. The situation resolved without incident once Victim 4 was able to see marked police cars outside his/her residence, and Victim 4 stepped out of his house with his/her handgun holstered and not in hand.

24. Victim 4 was the direct supervisor for SUBJECT in the NOC and was also the hiring and firing manager for SUBJECT. Victim 4 was interviewed by the FBI and provided that the only people targeted with all the extortion and threat calls and the swatting were NOC team

members plus the company president and chief financial officer. Victim 4 provided that he was raised by his grandmother, a fact likely known to SUBJECT through some of their discussions while working together. Victim 4 recalled that when he interviewed SUBJECT for a job with Victim 1, one skill that stood out was that SUBJECT had set up the SIP (session internet protocol) trunk at his previous employer so that if a delivery driver needed to contact a customer using a personal cell phone, the number displayed to the customer would be the company number, not the employee's personal cell phone number.

25. The second person swatted, Victim 5, is a NOC engineer at Victim 1 that no longer lives in Maine, but his/her parents do. The swatting call came in on December 23 from a spoofed number showing up as a number belonging to Victim 5, with a report of having killed his wife and having a friend at gunpoint. Police responded to the former residence of Victim 5, which is the current address for Victim 5's parents. The situation was resolved without further incident.

26. Five people, Victims 6, 7, 8, and 9 were swatted on December 24. Four worked in the NOC, the other is the CFO (previously noted Victim 3) of Victim 1. In one instance, the intended victim, Victim 6, retired as a NOC engineer approximately one year ago and lives out of state. His/her former residence in Maine was swatted twice, on December 24 and December 29. In another instance, the former residence of intended victim, Victim 7, was swatted. Victim 7 is a NOC engineer and sold his/her house within the past year.

### *Interviews of Victim 1 employees*

27. Interviews of numerous Victim 1 employees were conducted by the FBI. Several of those interviewees provided reasons as to why they believed SUBJECT could be responsible for the bomb threats, swatting, threat/extortion calls, and the DDoS. Multiple Victim 1

employees stated that they felt that the attacks were personal, that the threat actor was working off old information, and that the victims were mostly NOC team members from the time of SUBJECT's employment. Interviewees provided several examples: that some of the information the threat caller mentioned was dated to around the time of SUBJECT's employment, such as the use of Zerto and CD1, two no-longer used software applications at Victim 1; the fact that swatting Victim 5 had actually retired since SUBJECT had been fired; that SUBJECT had told employees at Victim 1 that he had been the first person ever swatted in Maine and seemed to brag of it; that before SUBJECT was terminated he had downloaded a large Victim 1 file that contained client and employee information; that the first person targeted (Victim 4) with swatting was the person who worked most closely with SUBJECT as his manager, and was the person who fired SUBJECT, and that particular swatting call invoked Victim 4's grandmother in the actual call; that the DDoS attacks targeted things that only someone who worked at Victim 1 would know to target; and lastly, in one of the calls to Victim 1, the threat caller angrily asked "why am I talking to the help desk lead?," after seemingly recognizing the person on the phone, but not knowing that the person had been promoted and was no longer working as a help desk lead.

### *SUBJECT'S Similar Threats and Extortion Demands in the Past*

28. In May, 2022, SUBJECT stole his father's pickup truck from his father's residence in Standish, Maine. Concurrent with the theft, SUBJECT sent a text message to his father that read as follows: "You have 34 hours to zelle or unlock the 100k in Edward jones or the black man who is in Philly with your truck is going to Molotov it. I'm on a flight right now so don't waste your time calling John kill or Kevin, I have boys outside their properties ready to kill, yes I said kill if you call 922-11 [sic] or pull some fuck shit. Give me a login to your fucking

13

Edward jones with my 100k or I'm leaving the country and I'll swipe the RV and all Jamie's Teslas when I run out of the 60k I have for the truck. Once I get confirms of money, you'll have a f350 back, until then, thanks for the advance. And if you're salty, good. You owe me your life. I was 10 feet from your face asleep with a Barretta [a common 9mm handgun brand]. I will put [name redacted; the 10 year-old nephew of SUBJECT] up on the black fucking market and put him in a body bag within 72 hours if I don't fucking get my 100k. Please be stupid old man". The text message combined with the pickup truck theft resulted in SUBJECT being charged under Maine criminal statutes with terrorizing and theft of the truck. Charges were later dropped in November 2022 when SUBJECT's father no longer wished to cooperate. However, SUBJECT's aunt, the mother of [redacted], applied for, and received, a protection from harassment order against SUBJECT in May 2022 for SUBJECT threatening to put her son on the black market and kill him unless SUBJECT was paid $100,000.

29. Cumberland County Sheriff's Office (CCSO), the investigating agency for the vehicle theft and terrorizing, provided relevant reports to the FBI, including a screen shot of aforementioned text message sent by SUBJECT to LAPOMARDA III's cell phone. At the top of the screenshot, a thumbnail image of a boy, labeled as "P-Man," is displayed. Based on other photographs I have seen of SUBJECT, the thumbnail image of "P-Man" is consistent with SUBJECT. CCSO confirmed to the FBI that P-Man was SUBJECT.

30. The similarities contained in the May 2022 text message threat involving SUBJECT's own father and nephew, and the aforementioned criminal activity against Victim 1, further support probable cause to believe SUBJECT used SUBJECT PHONE in furtherance of those criminal acts for the period December 20-29, 2022. Specifically, the overall language used in May 2022 threat is similar to the language in several phone calls placed to Victim 1

employees; the extortion demand from SUBJECT to his father for "100K" is the same amount that the threat caller started to say in his December 20 call to Victim 2 before correcting himself to "$300k," and the statement about having boys "outside their properties ready to kill" is similar to the December 28 call to Victim 3 in which the caller says "….he gets fucking killed. Okay? I have people, we have people in Maine…"

## TECHNICAL BACKGROUND

31. Google is a United States company that offers to the public through its Google Accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google Account, a free web browser called Google Chrome, a free search engine called Google Search, a free video streaming site called YouTube, a free mapping service called Google Maps, and a free traffic tracking service called Waze. Many of these free services offer additional functionality if the user signs into their Google Account.

32. In addition, Google offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Google also sells devices, including laptops, mobile phones, tablets, smart speakers, security cameras, and wireless routers. Users of Android and Google devices are prompted to connect their device to a Google Account when they first turn on the device, and a Google Account is required for certain functionalities on these devices.

33. Signing up for a Google Account automatically generates an email address at the domain gmail.com. That email address will be the log-in username for access to the Google Account.

34. Google advertises its services as "One Account. All of Google working for you." Once logged into a Google Account, a user can connect to Google's full suite of services offered to the general public, described in further detail below. In addition, Google keeps certain records indicating ownership and usage of the Google Account across services, described further after the description of services below.

35. Google offers a service called Google Voice through which a Google Account can be assigned a telephone number that can be used to make, record, and forward phone calls and send, receive, store, and forward SMS and MMS messages from a web browser, mobile phone, or landline. Google Voice also includes a voicemail service. Records are stored indefinitely, unless the user deletes them. Google Voice voicemail transcripts and missed call notifications can be sent to a user's Gmail account. And if a user logs into their Google Account on the Chrome browser, their subsequent Chrome browser and Google Search activity is associated with that Google Account, depending on user settings.

36. When individuals register with Google for a Google Account, Google asks users to provide certain personal identifying information, including the user's full name, telephone number, birthday, and gender. If a user is paying for services, the user must also provide a physical address and means and source of payment.

37. Google typically retains and can provide certain transactional information about the creation and use of each account on its system. Google captures the date on which the account was created, the length of service, log-in times and durations, the types of services utilized by the Google Account, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website or using a mobile application), details about the devices used to access the

account, and other log files that reflect usage of the account. In addition, Google keeps records of the Internet Protocol ("IP") addresses used to register the account and accept Google's terms of service, as well as the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the Google Account.

38. Google maintains the communications, files, and associated records for each service used by a Google Account on servers under its control. Even after a user deletes a communication or file from their Google Account, it may continue to be available on Google's servers for a certain period of time.

39. In my training and experience, evidence of who was using a Google account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

40. Based on my training and experience, messages, emails, voicemails, photos, videos, documents, and internet searches are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Thus, stored communications and files connected to a Google Account may provide direct evidence of the offenses under investigation.

41. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.,* information indicating a

plan to commit a crime), or consciousness of guilt (*e.g.*, deleting account information in an effort to conceal evidence from law enforcement).

## AUTHORIZATION REQUEST

42. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

43. I further request that the Court direct Google to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

_____
KEVIN KELLEY
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: Mar 10 2023

City and state: Portland, Maine

_____
Judge's signature

Karen Frink Wolf, U.S. Magistrate Judge
Printed name and title